### LOUISVILLE & N. R. CO.

### v.

### GALLOWAY'S ADM'X.

### LOUISVILLE & N. R. CO.

### v.

### GALLOWAY.

Court of Appeals of Kentucky.

Jan. 22, 1954.

J. P. Hamilton, H. T. Lively, J. L. Lenihan, Louisville, Clark & Manby, LaGrange, for appellant.

Ogden, Galphin & Abell, Louisville, James A. Hall, LaGrange, for appellee.

CULLEN, Commissioner.

Morgan H. Galloway was killed when his wife's automobile, which he was driving, was struck by a passenger train of the L. & N. Railroad Company on a grade crossing in the outskirts of the city of LaGrange. His widow was named administratrix, and as such she brought an action against the railroad for his wrongful death. She also sued individually for damage to her automobile. The actions were consolidated, and upon a jury trial judgment was entered in favor of the administratrix for $35,813, and in favor of the widow individually, for damage to her automobile, in the amount of $2,475. The railroad company appeals.

The railroad company was alleged to have been negligent in failing to give proper signals with the bell or whistle, in operating its train at an excessive speed, and in failing to keep a proper lookout. The company maintains that the evidence was insufficient to establish negligence in any of these respects, and that the company was entitled to a directed verdict. Before discussing these questions, we will state briefly the circumstances of the accident.

The accident occurred at 8:22 a. m. on October 20, 1950. The day was clear, dry and warm, and the sun was shining. The train was going in an easterly direction, coming into the city of LaGrange from the west. Galloway, alone in the automobile, was traveling in a southerly direction, on Sixth Street, which crosses the tracks at right angles. The Sixth Street crossing is some 1,500 feet from the center of town. The western city limits of LaGrange are some 1,900 feet west of the Sixth Street crossing, at a place known as the Anita Springs crossing. Between the city limits and Sixth Street, the railroad tracks are roughly paralleled by State Highway No. 146 on the north and a road known as Kentucky Street on the south. Except for houses facing on the west side of Sixth Street, there is only one house in the area between the two highways from the city limits to Sixth Street, which area varies in width from about 140 feet to 450 feet. The two highways are connected by a road which crosses the tracks 500 feet east of the Anita Springs crossing and 1,400 feet west of the Sixth Street crossing.

Kentucky Street, running parallel with the tracks on the south, is about 90 feet from the tracks at the Sixth Street crossing, and then angles northwardly to cross the tracks at Fourth Street, 700 feet to the east. A street known as Main Street commences at Sixth Street some 70 feet north of the tracks, and runs eastwardly, gradually approaching the tracks, to Fourth Street, where the tracks and Main Street converge. In this area along the right of way from Sixth Street to Fourth Street there are no buildings north of Kentucky Street or south of Main Street.

Because of houses and trees bordering on the west side of Sixth Street, the view from the tracks towards Sixth Street, and vice versa, is obstructed north of a point on Sixth Street 88 feet north of the crossing. At the 88-foot point there is a view up the tracks of from 260 to 290 feet, and at a point 50 feet north of the crossing there is a view up the tracks of 700 feet.

The engineer said that he first saw the automobile when the train was some 200 feet from the crossing; the automobile then was 70 or 80 feet from the crossing and was traveling 15 to 20 miles per hour. As the train approached the crossing the view of the engineer, who was sitting on the south side of the engine, was obstructed by the hood of the engine, and he did not again see the automobile until the fireman shouted that it had gone on the tracks immediately in front of the train.

The fireman testified that he first saw the automobile when the train was from 250 to 300 feet of the crossing; the automobile then was 40 or 50 feet from the crossing and was traveling 12 or 15 miles per hour; as the train approached the crossing the fireman thought the automobile would stop, but when the train got within 40 or 50 feet of the crossing he realized that the automobile was not going to stop and it went upon the crossing and stopped on the tracks. He then yelled to the engineer, who immediately applied the emergency brakes. The train was brought to a stop 476 feet past the crossing, or within a distance of some 526 feet after the brakes were applied.

Both the engineer and the fireman testified that there was nothing unusual about the movements of the automobile as it approached the crossing, and they both thought it would stop for the crossing.

There were no witnesses to the actual collision, other than the engineer and fireman, and no other witnesses saw the automobile approaching the crossing. Mr. Galloway was killed instantly.

There were no electrical signal devices at the crossing, and none were required by city ordinance.

■ Negligence of the railroad with respect to signals by the train was attempted to be established by proof that the whistle was not blown nor was the engine bell ringing as the train approached the crossing. The railroad admits that the whistle was not blown after the train entered the city limits, and it appears that this was because of a city ordinance prohibiting the sounding of whistles by "steam trains," which the railroad interpreted as applying also to diesel engines. However, the railroad maintained that the bell was rung continuously from a point outside the city limits until the train stopped after the accident. It is agreed that if the bell was rung continuously it was not necessary for the whistle to be blown. See Deitz' Adm'x v. Cincinnati, N. O. & T. P. R. Co., 296 Ky. 279, 176 S.W.2d 699.

The engine was equipped with a bell operated by air pressure, which would operate automatically when a switch was turned. The engineer and fireman both testified that the bell was turned on west of the Anita Springs crossing, and continued to ring thereafter until the train stopped following the collision. A Mrs. Ross, who was in the kitchen of her home some 350 feet east of the Sixth Street crossing, said that she heard the bell ringing as the train approached the crossing, before she heard the sound of the collision. Richard Doleman, who was standing in the yard of his home east of the Anita Springs crossing testified that the bell was ringing when the train came

into the city limits and that it continued to ring until the collision occurred.

For the other side, there was testimony of nine witnesses that they did not *hear* the bell ringing. None of these witnesses testified positively that the bell was not ringing, but one of them was positive that the whistle or horn was not blown. Four of these witnesses were not aware at all of the approach of the train; one saw the train as it entered the city limits; and the other four either heard the roar or rumble of the train as it approached the Sixth Street crossing or had heard the whistle as it was sounded for the Anita Springs crossing. One of the nine witnesses was standing in his yard near the Anita Springs crossing; one was in her house some 300 feet southwest of the Sixth Street crossing; two were at a filling station some 450 feet northeast of the latter crossing; one was in his yard about 300 feet northeast of the crossing; one was in a house some 500 feet east of the crossing; another was in a house some 200 feet southeast of the crossing; and two were painting a house some 700 feet east of the crossing.

This Court has for some time been firmly committed to the rule that negative testimony, to the effect that a witness or witnesses did not hear the bell ring or whistle blow, is not sufficient to create a jury issue in the face of positive evidence that the bell was rung or the whistle blown. See Chesapeake & O. R. Co. v. Burke's Adm'x, 299 Ky. 851, 187 S.W.2d 295; Fryrear v. Kentucky & Indiana Terminal R. Co., 310 Ky. 250, 220 S.W.2d 546. The decision in Cincinnati, N. O. & T. P. R. Co. v. Hare's Adm'x, 297 Ky. 5, 178 S.W.2d 835, is not to the contrary, but merely holds that witnesses who were watching a train pass by should have been permitted to testify specifically whether or not the whistle was blown, instead of being confined to the question of whether or not they heard the whistle. The Hare case recognizes that negative testimony of witnesses who are inside a dwelling with doors and windows closed, and with their minds on other things, is worthless.

It is our opinion that the evidence in the case before us was not sufficient to sustain a finding that the railroad was negligent in failing to ring the bell.

The contention that the railroad was negligent as to speed is predicated upon the proposition that the community where the accident occurred was thickly populated and the crossing was one extensively used. Reliance is had upon the rule that in cities and towns where the population is dense and from the number of persons passing the danger to life is great, the speed of trains must be moderated. Louisville & N. R. Co. v. Cummins' Adm'r, 111 Ky. 333, 63 S.W. 594; Louisville & N. R. Co. v. Molloy's Adm'x, 122 Ky. 219, 91 S.W. 685; Louisville & N. R. Co. v. McNary's Adm'r, 128 Ky. 408, 108 S.W. 898, 17 L.R.A.,N.S., 224; Hummer's Ex'x v. Louisville & N. R. Co., 128 Ky. 486, 108 S.W. 885; Louisville & N. R. Co. v. Scott's Adm'r, 184 Ky. 319, 211 S.W. 747.

As we understand these cases, the duty to moderate speed is a relative one, having relation to the density of the population and the extent of use of the crossing or tracks. Obviously, the restriction on speed would be greater in the center of the business section of a city than in the outskirts of the residential section. In the Molloy and Hummer cases, cited above, it was pointed out the mere fact that a crossing is within the city limits does not of itself require a reduction of speed. Also, in the Scott case, cited above, it was said that the speed need not be such that the train can be stopped instantly.

It would seem that the purpose of the requirement of moderation of speed is to insure that awareness of the approach of the train, by means of lookout or signals, will come to the ordinarily prudent motorist or pedestrian, through the other attention-diverting influences attendant upon traffic in a thickly populated area, in sufficient time and with sufficient forcefulness to enable him to avoid the danger.

The testimony of the engineer and the fireman, in the case before us, was that the

speed of the train as it entered the city limits was 40 to 45 miles per hour, and that as it approached the Sixth Street crossing the speed was reduced to 25 or 30 miles per hour. The supervisor of locomotive operation for the railroad company testified that upon the basis of actual tests made, a train of the size and character involved in this accident, on a grade the same as the one present in this case, could be stopped in a distance of 500 feet if it was traveling 25 miles per hour when the brakes were applied. If traveling 30 miles per hour the stopping distance would be 660 feet. This testimony was not contradicted, and when taken with the evidence that the train did stop within 526 feet from the point where the brakes were applied, tends strongly to prove that the speed of the train was not appreciably in excess of 25 miles per hour.

The appellee does not contend that a speed of 25 or 30 miles per hour would have been excessive, but she claims that the evidence of her witnesses shows that the train was going much faster than that. One witness who was in the yard of his home near the Anita Springs crossing estimated that the speed of the train as it entered the city limits was around 55 miles per hour. Another witness in the same general vicinity estimated the speed at around 45 or 50 miles per hour. Both said that the speed was not reduced appreciably as the train approached the Sixth Street crossing. Two witnesses standing in a filling station some 450 feet northeast of the crossing, and who only had glimpses of the train between houses, estimated that the speed of the train, after it had struck the automobile and was pushing it down the tracks east of the crossing, was around 35 miles per hour. One of these witnesses also said that he saw the train between houses west of the crossing, and he estimated it was traveling 45 to 50 miles per hour.

In view of the uncontradicted evidence that the train was stopped within a distance of some 526 feet, and that at a speed of 30 miles an hour it could not have been stopped in a distance shorter than 660 feet, we can give no weight to the estimates of the witnesses as to a higher speed of the train, based merely on casual observation as the train passed. Such estimates were at the most mere guesses, related to the witnesses' experience with the speed of automobiles. None of the witnesses were shown to have any qualification in estimating the speed of trains.

Some point is made of the alleged fact that the train traveled about three times the distance that the automobile traveled in the same space of time, as showing excessive speed of the train. According to the engineer, the train was 200 feet from the crossing when he saw the automobile 70 or 80 feet from the crossing, going 15 or 20 miles per hour. The evidence was that the automobile reached the crossing when the train was some 40 or 50 feet away. Thus the train traveled 150 or 160 feet while the automobile traveled half that distance. If the speed of the automobile was 15 miles per hour, this evidence would indicate that the train was going only 30 miles per hour.

The fireman said the train was 250 to 300 feet from the crossing, and the automobile 40 or 50 feet from it, when he first saw the automobile. He estimated the speed of the automobile at from 12 to 15 miles per hour. This testimony would tend to indicate that the train went five times the distance the automobile traveled in the same space of time. However, he also testified that the automobile had stopped on the tracks, when the train was 40 to 50 feet away, so any period of time the automobile had remained stopped would have to be taken into consideration in attempting to compare speed. If the automobile had remained stopped as long as two seconds, the train, at 30 miles per hour, would have traveled some 88 feet while the automobile remained stopped. This distance would have to be subtracted from the total distance the train traveled, in making a comparison with the distance the automobile traveled. Also, some consideration would have to be given to the fact that the speed of the automobile during the last few feet it traveled would be reduced as it came to a stop. So the fireman's testimony does not

necessarily fix the speed of the train at a rate in excess of 30 miles per hour.

The preceding discussion of the testimony as to comparative distances traveled by the train and the automobile shows that this kind of testimony is inconclusive, and in view of the positive evidence that the train could not have been stopped in the distance it was stopped if it had been going more than 30 miles per hour, we think that such testimony was not sufficient to establish excessive speed of the train.

It is our opinion that the evidence would not support a finding that the speed of the train was in excess of 30 miles per hour. However, we also are inclined to the view that a greater speed, perhaps as much as 50 or 60 miles per hour, would not have constituted negligence as concerns this particular crossing. The neighborhood was not densely populated; the right of way at the crossing was open and unobstructed for some 70 or 80 feet on each side of the tracks; there was a clear view up the tracks, in both directions, for a substantial distance; there was no evidence that the crossing was extensively used; and there were no distracting influences in the area to interfere with a motorist's use of his senses of sight and hearing to become aware of the presence of trains.

The contention that the railroad was negligent with respect to lookout is without merit. Both the engineer and the fireman saw the automobile, and until it was too late for them to take any action to avoid the accident it appeared to them that the automobile would stop for the crossing. There is no showing that a more careful lookout would have enabled them to do anything to prevent the accident.

It is our opinion that the evidence was not sufficient to establish any negligence on the part of the railroad and that a directed verdict should have been given for the railroad. If upon another trial the evidence is substantially the same, the court will direct a verdict.

We reserve the questions raised with respect to contributory negligence, erroneous instructions, improper argument, excessive damages, and a view by the jury of the scene of the accident.

The judgment is reversed, for proceedings in conformity with this opinion.

SIMS, J., not sitting.